PER CURIAM.
The petitioner, Delta International Machinery Corporation (hereinafter “Delta”), the defendant below, seeks a writ of mandamus directing the Geneva Circuit Court to vacate an order granting the motion filed by the plaintiff, Brandon Landrum, seeking access to certain technology purportedly in Delta’s control and seeking to inspect any device incorporating that technology. We grant the petition and issue the writ.

Facts and Procedural History

On December 21, 2006, Landrum was operating a portable bench saw manufactured by Delta. Landrum’s hand came into contact with the blade of the saw, resulting in the amputation of Landrum’s index finger and injuries to other fingers as well as to his hand.
In December 2007, Landrum sued Delta seeking damages under the Alabama Extended Manufacturer’s Liability Doctrine (“the AEMLD”) and alleging that the saw was defective and unreasonably dangerous. The parties agreed to a protective order, and the trial court entered that order on January 9, 2009. The protective order set forth certain safeguards for confidential materials that would be disclosed during discovery; it specifically forbade certain confidential materials from being released to Stephen Gass, Landrum’s expert witness, who apparently was employed by a corporation that was a competitor of Delta’s.
On December 21, 2009, Landrum filed, pursuant to Rule 26, Ala. R. Civ. P., a motion to inspect. Landrum alleged that a joint venture consisting of numerous power-tool manufacturers, which included Delta (hereinafter “the joint venture”), had developed a technology known as “flesh-sensing technology.” According to Land-rum, a saw with flesh-sensing technology can recognize when its blade comes into contact with human flesh, and the blade will automatically be diverted or stopped in an effort to avoid further injury. In his motion to inspect, Landrum requested that he be permitted to inspect “all saws equipped with any flesh-sensing technology as developed by the Joint Venture” and “any and all flesh sensing technology developed by the Joint Venture.” [1]
The saw that injured Landrum is a 10-inch portable bench saw manufactured in the 25th week of 2004.[2] In opposition to the motion to inspect, Delta argued that the flesh-sensing technology developed by the joint venture and any device developed by the joint venture incorporating the flesh-sensing technology were not discoverable because they did not exist at the time the saw was manufactured and were thus not relevant to Landrum’s case. The flesh-sensing technology under development by the joint venture, Delta asserted, was highly confidential and of a potentially high commercial value. Delta argued that the goal of the joint venture was merely to research flesh-sensing technology and not to incorporate such technology into existing saws. The device developed by the joint venture was not similar to the saw at *1175 issue in this case; it was merely a test device. Delta contended that technology developed by the joint venture did not exist when the saw by which Landrum was injured was manufactured and that it was not feasible to retrofit that saw to use the flesh-sensing technology. Thus, Delta argued, Landrum’s motion to inspect sought “irrelevant, confidential, and valuable information from a non-party entity over which [the trial] court lacks control or jurisdiction.” Delta also objected to allowing Stephen Gass to have access to the joint venture’s technology.
On February 9, 2010, the trial court granted Landrum’s motion to inspect. The trial court determined that the evidence sought by the motion to inspect was relevant; that even if the flesh-sensing technology was a trade secret it was nonetheless discoverable; that Delta did have control over the items sought to be inspected; and that the trial court did have control and jurisdiction over the members of the joint venture. The trial court also held that Stephen Gass would have access to the technology and would be permitted to inspect any device incorporating the technology. Delta filed a motion for a protective order relating to Landrum’s motion to inspect, which the trial court denied; [3] Delta subsequently filed this petition for a writ of mandamus.

Standard of Review

“ ‘A writ of mandamus will be “issued only when there is: 1) a clear legal right in the petitioner to the order sought; 2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; 3) the lack of another adequate remedy; and 4) properly invoked jurisdiction of the court.” Ex parte United Serv. Stations, Inc., 628 So.2d 501, 503 (Ala.1993).’
“Ex parte Horton Homes, Inc., 774 So.2d 536, 539 (Ala.2000). Regarding discovery matters specifically, this Court has stated:
“ ‘Discovery matters are within the trial court’s sound discretion, and this Court will not reverse a trial court’s ruling on a discovery issue unless the trial court has clearly exceeded its discretion. Home Ins. Co. v. Rice, 585 So.2d 859, 862 (Ala.1991). Accordingly, mandamus will issue to reverse a trial court’s ruling on a discovery issue only (1) where there is a showing that the trial court clearly exceeded its discretion, and (2) where the aggrieved party does not have an adequate remedy by ordinary appeal. The petitioner has an affirmative burden to prove the existence of each of these conditions.
“‘Generally, an appeal of a discovery order is an adequate remedy, notwithstanding the fact that that procedure may delay an appellate court’s review of a petitioner’s grievance or impose on the petitioner additional expense; our judicial system cannot afford immediate mandamus review of every discovery order.’
“Ex parte Ocwen Federal Bank, FSB, 872 So.2d 810, 813 (Ala.2003) (footnote omitted). In Ocwen, this Court identified ‘four circumstances in which a discovery order may be reviewed by a petition for a writ of mandamus.’ Ex parte *1176 Dillard Dep’t Stores, Inc., 879 So.2d 1134, 1137 (Ala.2003) (citing Ocwen). Those circumstances include:
“ ‘(a) [W]hen a privilege is disregarded, see Ex parte Miltope Corp., 823 So.2d 640, 644-15 (Ala.2001); (b) when a discovery order compels the production of patently irrelevant or duplica-tive documents the production of which clearly constitutes harassment or imposes a burden on the producing party far out of proportion to any benefit received by the requesting party, see, e.g., Ex parte Compass Bank, 686 So.2d 1135, 1138 (Ala.1996); (c) when the trial court either imposes sanctions effectively precluding a decision on the merits or denies discovery going to a party’s entire action or defense so that, in either event, the outcome of the case has been all but determined and the petitioner would be merely going through the motions of a trial to obtain an appeal; or (d) when the trial court impermissibly prevents the petitioner from making a record on the discovery issue so that an appellate court cannot review the effect of the trial court’s alleged error. The burden rests on the petitioner to demonstrate that its petition presents such an exceptional case — that is, one in which an appeal is not an adequate remedy. See Ex parte Consolidated Publ’g Co., 601 So.2d 423, 426 (Ala.1992).’
“Dillard, 879 So.2d at 1137.”
Ex parte Guaranty Pest Control, Inc., 21 So.3d 1222, 1225-26 (Ala.2009).

Discussion

Citing Ex parte Miltope Corp., 823 So.2d 640 (Ala.2001), Rule 26, Ala. R. Civ. P., and Rules 401 and 402, Ala. R. Evid., Delta argues that the flesh-sensing technology and the device incorporating that technology developed by the joint venture amount to trade secrets and are also not relevant in this case, because they did not exist when the saw that injured Landrum was built. Delta contends that it should not be required to disclose such confidential technology when the technology has no relevance to Landrum’s claims. We agree.
In Miltope, we discussed the relevancy of potentially discoverable evidence:
“Rule 26(b), Ala. R. Civ. P., defines the scope of discovery as follows: ‘Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action.’ Even material that would be inadmissible at trial is discoverable, provided that the material ‘appears reasonably calculated to lead to the discovery of admissible evidence.’ Id. In determining whether the information sought by a party ‘appears reasonably calculated to lead to the discovery of admissible evidence,’ a court must consider the nature of the plaintiffs claim and whether, in light of the claim, the plaintiff has demonstrated a particularized need for the discovery being sought. See Ex parte First Nat’l Bank of Pulaski, 730 So.2d 1160, 1162 (Ala.1999).”
823 So.2d at 643.
In the instant case, the trial court, in its February 9 order, discussed the relevancy of the flesh-sensing technology:
“The Court finds that [Landrum’s] request for an inspection of the [joint venture’s] technology and devices developed from the technology is reasonably calculated to lead to the discovery of admissible evidence. [Landrum] may well be able to establish that ... the technology was feasible when the subject saw was manufactured based upon the inspection. [Landrum] presented testimony from *1177 Ted Gogall,[4] one of the joint venture representatives for Delta, that the component parts of the [joint venture’s] device were technologically available in 2004 and the people that really understood the devices probably could have combined components together for this type application in 2004. [Landrum] has presented testimony from Gogall where Mr. Gogall has testified that the Joint Venture technology ‘probably’ could have been developed and available in the 25th week of 2004 if the industry ‘had wanted to do this or there was a need to do this.’ Mr. Gogall explained that it is possible that ‘the experts in this particular industry1, i.e., the tool industry, ‘could have spent the money and funded a project and put resources on [flesh-sensing technology] and developed [flesh-sensing technology].’ Gogall also testified the technology which [Land-rum] seeks to inspect could ‘certainly’ be transferred to portable table saws as small as the 60 pound DeWalt model 744 saw. This testimony is important because of Delta’s contention that the subject 40 pound saw was too small to accommodate flesh sensing technology. Finally, Gogall testified that the way the [joint venture’s] device functions is ‘hard to explain without seeing it.’ ”
(Citations omitted; some alterations in original.)
In its petition, Delta contends that the trial court misstated the content of Ted Gogoll’s testimony. We agree. The materials before us reveal that Gogoll did not testify that all the components of the flesh-sensing device were available when the saw that injured Landrum was manufactured. He specifically testified that the “algorithm” for the device, which was apparently necessary “to develop the control system,” was not available in 2004. Additionally, although several components for a flesh-sensing device were available in 2004, Gogoll agreed during his deposition “that those had not been compiled together for this type of application” at the time the saw that injured Landrum was made. He said that there were people who “probably” could have assembled the components and that it was “possible” that those people “could have” spent money to develop such a device, but he did not “really know” because he was not an expert in that area:
“[Counsel for Landrum:] Okay. So my question would be is could those items have been combined in that manner in 2004, in the 25th week in 2004 when this saw was made?
“[Gogoll:] No, because nobody had done it.
“[Counsel for Landrum:] Is there any other reason why?
“[Gogoll:] By that time, I think the technological ideas were there. If someone was going to put the resources together to develop them, that’s just— that’s just a blue sky question.
“[Counsel for Landrum:] Explain your answer a little bit more.
“[Gogoll:] Well, you have to — the people that really understand these devices are the people that probably could have done it. The experts in this particular industry, if they had wanted to do this or there was a need to do this, it’s possible they could have spent the money and funded a project and put resources on it and developed it.
“[Counsel for Landrum:] In the 25th week of 2004 or before that time?
“[Gogoll:] You know, I really don’t know. It’s possible, but I don’t know the state of the art of that type of *1178 device. I’m not an expert in that type— in that industry.
“I am guessing that the state of the art might have been there, but I really don’t know. I’m not an expert in that particular area.
[[Image here]]
“[Counsel for Landrum:] Sir, have you understood my questions?
“[Gogoll:] I understood your questions. And I really can’t answer them. As I said, I’m not — I’m not an expert in that particular type of business.”
Although Gogoll expressed an uncertain opinion that flesh-sensing technology could possibly have been developed in 2004, when the saw that injured Landrum was manufactured, as discussed below Gogoll confirmed that such technology did not actually exist for this particular type of saw at the time the saw was manufactured.
The trial court stated that “Gog[o]ll also testified the technology which [Landrum] seeks to inspect could ‘certainly’ be transferred to portable table saws as small as the 60 pound DeWalt model 744 saw. This testimony is important because of Delta’s contention that the subject 40 pound saw was too small to accommodate flesh sensing technology.”
However, as to the saw involved in this accident, Gogoll specifically stated that such technology was not available even at the time of his deposition:
“[Counsel for Landrum:] Right. My question, though, was does the Joint Venture think the technology it has developed will be transferable to the portable ten-inch bench saw like was involved in this accident?
“[Gogoll:] I honestly don’t know. There may or may not be a saw like that in the future depending on where we get.
“[Counsel for Landrum:] In other words, the model, that ten-inch bench saw may not even be manufactured?
“[Gogoll:] It certainly might — it might be different. That has not been a project yet.
“[Counsel for Landrum:] Why not?
“[Gogoll:] Why? Because the comp— the technology’s complicated enough to try to figure it out on something where you have a stable platform.
[[Image here]]
“[Counsel for Landrum:] Here’s my question. If those smaller saws, whatever models they are that make up the bulk of the market, if those are the number-one sellers, why hasn’t this technology been tested for those saws?
[[Image here]]
“[Gogoll:] ... [R]ight now the technology is, is tough enough to develop right now on a stable platform that, you know, it isn’t even totally developed on that kind of platform.”
Finally, Gogoll was asked the following question at his deposition: “Do you intend to tell the jury that in the 25th week of 2004 that flesh-sensing technology existed?” He answered: “I would not say that, particularly because there was not flesh-sensing technology available for this type of saw.”
Contrary to the trial court’s order, Go-goll’s testimony simply does not indicate that the flesh-sensing technology was available for the saw at issue in this case at the time it was manufactured. It is therefore unclear how the trial court could have determined from Gogoll’s testimony that flesh-sensing technology existed at the time the saw was manufactured and that that technology could have been incorporated into the saw. Thus, the trial court based its ruling on the erroneous premise that the flesh-sensing technology held by *1179 the joint venture and any device incorporating that technology is relevant to Land-rum’s case.
In response to the petition for the writ of mandamus, Landrum contends that his claims
“include that Delta could have included flesh sensing technology since it was available and feasible if Delta had only taken the steps they have taken all too late. Specifically ... [Gogoll] testified under oath that the flesh-sensing technology as developed by the Joint Venture, ‘probably’ could have been developed and available in the 25th week of 2004....
“Accordingly, since [Landrum’s] claims are that [Delta] should have incorporated flesh-sensing technology into portable bench top saws manufactured in the 25th week of 2004 on which Mr. Brandon Landrum was injured, and since [Delta’s] own expert and corporate representative has clearly testified that such technology ‘probably’ could have been made available at least as early as the 25th week of 2004, and could be incorporated into a 60 pound portable bench saw, inspection of the [joint venture’s] device is both relevant and necessary in order to proceed with additional discovery as may be determined following the inspection.”
As noted above, Gogoll clearly testified that the joint venture’s current technology cannot be incorporated into the saw that injured Landrum and that the technology did not exist in 2004. Delta contends that Landrum’s argument is essentially that Delta had a duty to develop and invent flesh-sensing technology at the time the saw by which he was injured was manufactured. However, under the AEMLD, Landrum has the burden of showing that a safer, practical, alternative design was available, not whether such an alternative could have been designed. Beech v. Outboard Marine Corp., 584 So.2d 447, 450 (1991) (“We decline to hold, as a matter of law, that simply because ‘a feasible propeller guard could have been designed by a proper use of the manufacturer’s resources’ that an ‘alternative design’ existed.”).
Delta contends that not only is the joint venture’s flesh-sensing technology not relevant, but it also is a trade secret; thus, it argues, disclosure of that technology could lead to irreparable harm. In Miltope, we noted the definition of a “trade secret”:
“The information Miltope seeks to avoid disclosing qualifies as a trade secret. Section 8-27-2(1), Ala.Code 1975, states that a ‘trade secret’ is information that:
“ ‘a. Is used or intended for use in a trade or business;
“ ‘b. Is included or embodied in a formula, pattern, compilation, computer software, drawing, device, method, technique, or process;
“‘c. Is not publicly known and is not generally known in the trade or business of the person asserting that it is a trade secret;
“ ‘d. Cannot be readily ascertained or derived from publicly available information;
“‘e. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; and “‘f. Has significant economic value.’ ”
Miltope, 823 So.2d at 644.
Landrum argues that the flesh-sensing technology was not a trade secret under this definition for several reasons. First, Landrum contends that the flesh-sensing device built by the joint venture was not intended for use in a trade or business and was, instead, created “in response to litiga *1180 tion.” Further, he argues, the device is not intended to be sold. However, it is readily apparent from the materials before us that the device was built to incorporate flesh-sensing technology for use by the members of the joint venture in their trade or business.
Landrum also contends that because the joint venture consists of several power-tool companies, the flesh-sensing technology is not a secret inside the tool industry. However, Delta provided evidence indicating that the five companies within the joint venture have signed confidentiality agreements; that only a few individuals within those companies actually have access to the flesh-sensing technology; and that the flesh-sensing technology remains highly confidential.
Finally, Landrum contends that the information is readily ascertainable from the trial record of unrelated litigation in Massachusetts and from patent records. Delta included examples of the testimony and notes that the evidence in the unrelated litigation was generic and — like the patents — did not include numerous details regarding the properties of the flesh-sensing technology. Thus, those details remain unascertainable to the public. We agree that the flesh-sensing technology remains a trade secret.
In Miltope, this Court noted the sensitive nature of trade secrets and concerns regarding the disclosure of such information in the discovery process:
“ ‘If a trial court orders the discovery of trade secrets and such are disclosed, the party resisting discovery will have no adequate remedy on appeal. The proverbial bell cannot be unrung and an appeal after final judgment on the merits will not rectify the damage.’ Gibson-Myers & Assocs. v. Pearce, (No. 19358, Oct. 27, 1999) (Ohio Ct.App.1999) (unpublished). Trade secrets should receive greater protection from discovery because they ‘derive[] economic value from being generally unknown and not readily ascertainable by the public.’ Nester v. Lima Mem’l Hosp., 139 Ohio App.3d 883, 888, 745 N.E.2d 1153, 1157 (2000) (Walters, J., dissenting). ‘Once the information becomes available through the discovery process, a subsequent appeal, even if successful, cannot restore the valuable secretive nature.’ Id. Disclosure of a trade secret could cause ‘irreparable harm.’ Binkley v. Allen, (No.2000-CA-00160, Feb. 5, 2001) (Ohio Ct.App.2001) (unpublished).... We conclude that the trial court abused its discretion in compelling Miltope to produce the requested documents, because of the risk of harm to Miltope caused by disclosure of its trade secrets.”
Miltope, 823 So.2d at 644-45 (footnotes omitted).
In the instant case, the materials before us reveal that the flesh-sensing technology both was a trade secret and was not relevant to Landrum’s claims. Given the unique facts of this case, we conclude that the trial court exceeded its discretion in allowing discovery of that technology and any device incorporating the technology and in allowing access to the technology and the device by Delta’s competitor.

Conclusion

The petition is granted, and the trial court is directed to vacate its order granting Landrum’s motion to inspect.
PETITION GRANTED; WRIT ISSUED.
WOODALL, STUART, BOLIN, PARKER, MURDOCK, SHAW, MAIN, and WISE, JJ., concur.
COBB, C.J., concurs in the result.

. The motion further sought to allow Land-rum to inspect any technology that was “equal to, or superior to, SawStop technology.” "SawStop” is apparently a product developed by Stephen Gass’s company incorporating the flesh-sensing technology.

. The materials before us variously describe the saw as weighing either 29, 30, or 40 pounds.

. The Power Tool Institute, the organization that formed the joint venture, filed an ''opposition” to allowing Stephen Gass access to the technology, contending that Gass worked for a competitor and that he had several patents and patent applications regarding similar technology. The Power Tool Institute contended that Gass might amend his patents and patent applications to cover the joint venture’s technology, thus denying the members of the joint venture their investments. The trial court overruled this opposition.

. It appears from the record that Ted Gogall's last name is actually spelled "Gogoll.”